IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

WILLIAM D. FLORES,

       Plaintiff,

v.                                                                    CIV 14-1008 JB/KBM

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

       Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

Pursuant to 28 U.S.C. § 636(b), this matter has been referred to me for a recommended disposition. *Doc. 5.* Having carefully reviewed the parties' positions and the material portions of the record, the Court recommends that Plaintiff's Motion to Reverse and Remand for a Rehearing (*Doc. 16*) be denied.

## I.  BACKGROUND AND PROCEDURAL HISTORY[1]

William Flores ("Plaintiff") worked as a structural carpenter for roughly thirty-two years before applying for disability due to breathing and mental problems. *AR* at 169; 344. Plaintiff's difficulty breathing results from years of working amidst various particulates at construction sites and from smoking. *Id.* at 288-89. Plaintiff entered the construction field after dropping out of high school, which he attributes to his below-average intelligence, lack of educational and familial support, and depression. *See id.* at 344. Nevertheless, Plaintiff was "lead worker" during his time as a structural carpenter,

---

[1]  Document 13 and all attachments thereto comprise the sealed Administrative Record ("AR"). The Court cites the Record's internal pagination, rather than the CM/ECF document and page numbers.

despite the fact that he received no specialized training and attended no trade or vocational schooling. *Id.* at 162, 170-1.

Plaintiff met with Social Security Administration representatives on March 8, 2011 and protectively applied for Disability Insurance Benefits on March 23, 2011, claiming a disability onset date of January 21, 2008. *AR* at 144-160.[2] Plaintiff's claims were initially denied on September 2, 2011, *id.* at 57-68, 82-85, and upon reconsideration on February 10, 2012. *Id.* at 69-81, 86-98. Upon receipt of the denial, Plaintiff requested a hearing before an Administrative Law Judge. *AR* at 99-100.

Administrative Law Judge Myriam C. Fernandez Rice ("the ALJ") held a *de novo* hearing on February 6, 2013, at which vocational expert Pamela Bohmann ("the VE") testified and attorney Mark Hendricks represented Plaintiff. *Id.* at 30-56, 110, 117, 138-41. The ALJ issued her decision that Plaintiff was not disabled on March 25, 2013. *Id.* at 11-25. The Appeals Council denied Plaintiff's request for review of the ALJ's decision. *Id.* at 1-3. As such, the ALJ's Decision became the final decision of the Commissioner. *Doyal v. Barnhart*, 331 F.3d 758, 459 (10th Cir. 2003). This Court has jurisdiction to review the decision pursuant to 42 U.S.C. § 405(g) and 20 C.F.R. § 422.210(a).

## II.     THE ALJ'S DECISION

A plaintiff seeking disability benefits must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). In evaluating a plaintiff's eligibility for benefits

---

[2] Plaintiff previously applied for benefits on April 29, 2009, and was denied upon his initial application. *AR* at 59, 158-9.

an ALJ is required to use a five-step sequential evaluation process. 20 C.F.R.

§§ 404.1520(a)(4); 416.920(a)(4).

At Step One the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2014, and had not engaged in substantial gainful activity since January 21, 2008, his alleged onset date. *AR* at 16. At Step Two the ALJ found evidence that Plaintiff suffers from the following severe impairments: "chronic obstructive pulmonary disease (COPD); borderline intellectual functioning; depression; asthma; [and] umbilical hernia." *Id.* At Step Three, the ALJ concluded that Plaintiff's impairments did not meet or medically equal the regulatory "listings." *Id.* at 12; *see generally* 20 C.F.R. § 404, Subpt. P, App. 1.

When a plaintiff does not meet a listed impairment the ALJ must determine his residual functional capacity ("RFC"). *Hendron v. Colvin*, 767 F.3d 951,953 (10th Cir. 2014). "RFC is a multidimensional description of the work-related abilities [a plaintiff] retain[s] in spite of [his] medical impairments." 20 C.F.R. § 404, Subpt. P, App. 1 § 12.00(B); 20 C.F.R. § 404.1545(a)(1). Based on her review of the record, the ALJ found that Plaintiff has the RFC "to perform light work as defined in 20 CFR 404.1567(b) except he should avoid even moderate exposure to extreme cold; wetness or humidity; environmental irritants such as fumes, odors, dusts, gasses, chemicals, and poorly ventilated areas." *AR* at 18. The ALJ further found that Plaintiff "is limited to occupations not requiring complex written communication and work is limited to simple, routine, repetitive tasks." *Id.* In making this determination the ALJ stated that she considered the entire record in addition to the records she specifically described. *Id.*

Taking Plaintiff's RFC into account, at Step Four, the ALJ found that Plaintiff is unable to perform his past relevant work. *Id.* at 24. Then, at Step Five, the ALJ found

that Plaintiff retains the RFC to perform jobs that exist in significant numbers in the national economy—namely, small products assembler, mail sorter, and cashier. *Id.* Accordingly, the ALJ found that Plaintiff is not disabled under the Medical-Vocational Guidelines. *Id.* at 25.

### III.    ANALYSIS

This Court "review[s] the Commissioner's decision to determine whether the factual findings are supported by substantial evidence and whether the correct legal standards were applied." *Vigil v. Colvin*, 805 F.3d 1199, 1201 (10th Cir. 2015) (quoting *Mays v. Colvin*, 739 F.3d 569, 571 (10th Cir. 2014)). "Substantial evidence" has been described as "more than a scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hendron*, 767 F.3d at 954 (quoting *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir.1994)). "Evidence is not substantial if it is overwhelmed by other evidence or is actually a mere conclusion." *Slocum v. Sec'y of Health & Human Services*, 9 F.3d 117 (10th Cir. 1993) (unpublished) (citing *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir.1988)). The Court conducts its inquiry "via a meticulous examination of the record as a whole[,]" *Wall v. Astrue*, 561 F.3d 1048, 1067 (10th Cir. 2009), which includes examining "anything that may undercut or detract from the ALJ's findings[.]" *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

The Court is not permitted to reweigh evidence, second guess, or substitute its judgment for that of the ALJ, *Wall*, 561 F.3d at 1070, as it is the ALJ's prerogative to resolve evidentiary conflicts, so long as her finding is supported by substantial evidence. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1172 (10th Cir. 2012). Additionally, "[t]he ALJ is not required to discuss every piece of evidence. . . [o]n the contrary, [the Tenth Circuit] will generally find the ALJ's decision adequate if it discusses the 'uncontroverted

4

evidence' the ALJ chooses not to rely upon and any 'significantly probative evidence' the ALJ decides to reject." *Wall*, 561 F.3d at 1067. Moreover, if the ALJ indicates that she has considered all evidence in the record, the Court generally must take her "at [her] word." *Id.* at 1070 (quoting *Flaherty*, 515 F.3d at 1071).

### A) PLAINTIFF'S RFC ACCOUNTS FOR IMPAIRMENTS RELATED TO HIS COPD, RENDERING ANY ERROR AS TO ITS FORMAL STRUCTURE HARMLESS.

Plaintiff argues that the ALJ "had a duty to provide a function-by-function analysis" of his ability to perform each of the seven strength demands as set forth in SSR 96-8p, and committed reversible error by failing to account for his inability to stand, walk and lift for sustained periods. *Doc. 16* at 13. Plaintiff argues that this omission caused further error in the ALJ's failure to account for his coughing and fatigue impairments, which he says are "brought on" by walking, lifting, bending and sitting." *Id.* at 14.

In the past, strict adherence to SSR 96-8p's requirement of a function-by-function analysis in determining the RFC provided the reviewing court with a well-established and straightforward method for assessing whether the RFC was based on substantial evidence and if it supported the ALJ's conclusions as to the level of work, if any, the claimant could undertake. "The concern [was] that, without a function-by-function analysis, an ALJ 'may . . . overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do.'" SSR 96–8p, 1996 WL 374184, at *4. Thus, in the absence of a mandatory and proper function-by-function analysis, the case was automatically remanded for the ALJ to perform that necessary assessment. *See, e.g.*, *Southard v. Barnhart*, 72 Fed. Appx. 781, 784 (10th Cir. 2003) (unpublished).

5

However, the Tenth Circuit recently held that omission of the formulaic analysis set forth in SSR 96-8p can be harmless provided that the ALJ's decision discusses and addresses any pertinent limitations and is otherwise supported by substantial evidence. *Hendron*, 767 F.3d at 954-57 ("Where, as here, we can follow the adjudicator's reasoning in conducting our review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal."). This new "harmlessness" exception now requires the reviewing Court to engage in the arduous and time-consuming task of combing the ALJ decision and evidence of record to assure that no limitations have been omitted from the RFC. However well-intentioned, the *Hendron* exception shifts the ALJ's duty to support her conclusions with a proper analysis to the district court who must now assure that all relevant limitations were addressed. Having conducted this extensive review as I must, the Court concludes that any structural error in the analysis in this case is harmless. *Id.* at 957.

"RFC determines a work capability that is exertionally sufficient to allow performance of at least substantially all of the activities of work at a particular level." SSR 83-10, 1983 WL 31251 at *2. It is a reflection of "the maximum amount of each work-related activity the individual can perform," and, in reaching it, an ALJ must describe the "individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, *7. Ordinarily, an ALJ may not simply express an RFC in terms of the exertional categories of "sedentary," "light," "medium" or "heavy" levels of work. Rather, in order to insure accuracy, "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function

6

basis," including the "seven strength demands" of sitting, standing, walking, lifting, carrying, pushing and pulling. *Id.* at *1, 5; (citing 20 C.F.R. § 404.1545; 10 C.F.R. § 416.945). However, the Tenth Circuit has made clear that an ALJ's omission of this formulaic analysis is harmless so long as it is apparent that the ALJ considered the applicable strength demands. *See Hendron* 767 F.3d at 957.

In *Hendron* the plaintiff argued that the ALJ's omission of the function-by-function assessment resulted in his omission of her inability to sit for six hours during an eight-hour workday when formulating her RFC. *Id.* at 956. Had the ALJ engaged in the proper analysis, she argued, he would have not found that she retained the capacity to perform a full-range of sedentary work. *Id.* The Tenth Circuit acknowledged the importance of a formal articulation of an applicant's strength demands in some cases. *Id.* (discussing SSR 96-8p, 1996 WL 374184 at *3). The court concluded, however, that the omission was harmless in Ms. Hendron's case because the ALJ considered the medical evidence she relied on and discounted it, noting that the records revealed that the plaintiff reported being "pain free" during the relevant time period. *Id.* at 957. The Tenth Circuit compared the ALJ's findings with the regulatory definition of sedentary work and concluded that the ALJ's RFC analysis sufficiently captured the plaintiff's ability to sit, because, although it was presented in narrative form, it demonstrated that "the ALJ did not overlook [the plaintiff's] problems with sitting; [but, rather] he found that the evidence did not support any limitation on her ability to sit. . . ." *Id.* The ALJ's analysis in this case is analogous.

In formulating Plaintiff's RFC, the ALJ first discusses Plaintiff's testimony at the hearing. *AR* at 19. Plaintiff testified that most aspects of construction work exacerbate his COPD-related symptoms. For example, Plaintiff stated that lifting, bending, walking

and standing exacerbate his symptoms. *Id.* at 19, 40, 42. However, reaching is not an

issue. *Id.* at 19, 43. Plaintiff indicated that he can lift thirty to forty pounds and hold

twenty pounds for two to three minutes. *Id.* at 19, 42-43. Plaintiff stated that cold

weather, allergens and dust exacerbate his symptoms. *Id.* at 19, 37. Plaintiff explained

that his coughing limits his ability to pick up and hold items. *Id.* at 19, 43. Plaintiff also

stated that he can only sit for around an hour because his weight puts pressure on his

lungs. *Id.* at 19, 43-44. Plaintiff further explained that after sitting or lying down he has to

get up and move around to keep from coughing. *Id.* at 46. However, Plaintiff also

indicated that he cannot walk for very long or else this, too, will cause a coughing fit. *Id.*

at 46. Plaintiff stated that he has coughing fits anywhere between seconds and minutes.

*Id.* at 19, 43. The ALJ states these facts and summarizes them as Plaintiff "coughs

constantly on a daily basis." *Id.* at 19. The ALJ also notes Plaintiff's testimony that he

takes various medications (Albuterol, Symbicort) but does not take oxygen. *Id.* at 19.

The ALJ then discussed Plaintiff's medical history. The ALJ notes that in April of

2008 Plaintiff presented to the University of New Mexico Hospital Clinic complaining of

difficulty breathing and that, at that time, Plaintiff's x-rays showed no acute finding and

were unchanged as compared to x-rays from 2006. *Id.* at 20. Plaintiff was diagnosed

with "probable airway disease" and was prescribed Symbicort and Albuterol inhalers. *Id.*

The ALJ recites that x-rays from April of 2009 "were stable with no acute

cardiopulmonary process." *Id.* Shortly thereafter, Plaintiff presented for a follow-up visit

in May 2009. *Id.* at 20. The ALJ states that records from that visit indicate that Plaintiff

had a "two-year history of ongoing smoker's cough, at which time the Plaintiff had

stopped smoking." *Id.* Plaintiff told his doctor that his symptoms started two weeks prior

to the visit. *Id.* Plaintiff was diagnosed with acute exacerbation of chronic bronchitis, was

8

treated on a steroid taper, which helped, was prescribed doxycycline, and was restarted on Symbicort and Albuterol. *Id.* Later that month Plaintiff reported his symptoms had largely resolved at least in part due to the steroid treatment. *Id.* at 20. Plaintiff's lungs were clear, and forced expiration did not elicit a wheeze. *Id.* Plaintiff was diagnosed with chronic bronchitis, and he was put on a steroid taper. *Id.* It was noted that Plaintiff was not consistently taking his medications. *Id.*

The next visit the ALJ documented was in July 2009 when Plaintiff reported "a moderate amount of difficulty with cough and nocturnal wakening." *Id.* at 20. Plaintiff's doctor noted that he "felt that he had done a lot better" while on Symbicort. *Id.* at 21. Plaintiff told his doctor that his cough worsened when lying on his back but that the Albuterol allowed him to clear out a moderate amount of the fluid in his lungs. *Id.* The ALJ states that Plaintiff reported to his doctor that he was generating less sputum but that the winter weather was exacerbating his bronchitis. *Id.* Plaintiff's doctor indicated that he needed increased therapy because of the severity of his asthma. *Id.*

The next visit the ALJ noted was in February, 2010. *Id.* at 21. At that time Plaintiff presented with a three-day history of cough, shortness of breath, wheezing and productive cough. *Id.* Plaintiff was assessed with asthma exacerbation and was treated with a nebulizer. *Id.* The ALJ notes that Plaintiff "felt considerably better and coughed less after treatment." *Id.* Plaintiff was prescribed Prednisone, Loratadine, and Ipratropium. A week later Plaintiff returned for a follow-up visit and reported feeling 25% better. *Id.* Plaintiff still complained of a cough, but stated that it had improved with Prednisone and that his breathing was "quite a bit better and that his nasal congestion was less, but he felt mucus in his throat." *Id.* Plaintiff was diagnosed with COPD, was

given an Albuterol nebulizer treatment, was prescribed an extended Prednisone taper, and was directed to continue using Albuterol as needed. *Id.*

The ALJ references Plaintiff's return to the doctor in May 2011 with complaints of chronic cough. *Id.* at 21. Testing was not completed on Plaintiff because of constant coughing fits, which occurred every 30-45 minutes and lasted from "seconds to 10-15 minutes apiece." *Id.* Plaintiff reported that his coughing was worse in winter and in the morning. *Id.* The ALJ notes that the medical records indicate that at this visit Plaintiff took out his Albuterol inhaler and took a quick puff on it, "holding it not even for a couple of seconds." *Id.* Chest x-ray showed no active disease or change. *Id.* Plaintiff was assessed with chronic severe asthma and possible COPD due to his long history of smoking. *Id.* The records indicate that Plaintiff's symptoms were believed to be secondary to improperly utilizing prescribed medication. *Id.* Plaintiff was educated as to the proper use of his Albuterol inhaler with a spacer, and was given written instructions on the use of Albuterol, Symbicort, Ipratropium and Singulair. *Id.*

The final record relevant to Plaintiff's COPD the ALJ discusses is from September 2012, when Plaintiff presented to the emergency department complaining of shortness of breath and coughing over the previous two weeks. *Id.* at 22. The ALJ notes that Plaintiff reported to the doctor two weeks prior to this visit, but that visit is apparently not documented in the record. *Id.* Plaintiff reported at this appointment that these symptoms normally develop into an infection and that he wanted to take care of it before it got to that point. *Id.* Plaintiff believed the changing climate was an exacerbating factor. *Id.* Chest x-ray found no acute cardiopulmonary disease, and Plaintiff was treated with nebulizers and Prednisone. *Id.* at 22-3.

The ALJ also considered the function report submitted by Plaintiff's wife. *AR* at 23. Plaintiff's wife reported that Plaintiff cares for his grandchildren, watches TV daily, performs light household chores and yard work, has no problem with personal care, goes outside daily alone (unless it is cold), can walk five minutes without rest, and does not use crutches, a walker, a wheelchair or a cane. *Id.* at 175-82. The ALJ concluded after reviewing this report that Plaintiff is able to perform many activities of daily living, although with some limitations which she found were no greater than those set forth in the RFC. *AR* at 23.

After considering this evidence, the ALJ found "no medical records that justify that the claimant should perform less than light work." *AR* at 23. Accordingly, the ALJ found that Plaintiff has the residual functional capacity "to perform light work as defined in 20 CFR 404.1567(b) except that he should avoid even moderate exposure to extreme cold; wetness or humidity; environmental irritants such as fumes, odors, dusts, gasses, chemicals, and poorly ventilated areas." *AR* at 18. These exceptions themselves account for Plaintiff's coughing and fatigue impairments, which he is arguing affect his ability to stand, walk and lift. *Doc.* 16 at 13-19. More significant, however, is the ALJ's finding that no medical records support greater restrictions to Plaintiff's ability to work than she identified. This is important because the Tenth Circuit has held that the RFC analysis need not account for limitations which are supported by nothing other than a Plaintiff's own testimony. *Wall*, 561 F.3d at 1067-8;[3] *Rose v. Colvin*, ___ F. App'x ____,

---

[3] In *Wall*, the plaintiff argued that the ALJ failed to consider her fatigue and migraine headache impairments when formulating her RFC. *Id.* at 1067-8. The Tenth Circuit rejected this argument as to the plaintiff's migraines because they were never diagnosed by a medical provider. *Id.* at 1067. The ALJ's decision to omit the plaintiff's fatigue impairment was also affirmed because there was little evidence in the record to support it other than the claimant's own subjective complaints. *Id.* at 1068. The Tenth Circuit was confident in its decision to affirm because the

2015 WL 8593444 at *4 (10th Cir. 2015) (unpublished) ("Ms. Rose points to no medical evidence indicating that her obesity resulted in functional limitations. . . . Therefore, the factual record does not support Ms. Rose's position that her obesity . . . precludes her from performing a limited range of sedentary work.") (citing *Howard v. Barnhart*, 379 F.3d 945, 948 (10th Cir. 2004)).

Of course, Plaintiff argues that there are records supporting his impairments but that these records were omitted by the ALJ, whose discussion of the records presents a mere "snapshot" of his treatment history. *Doc. 16* at 14. The Court is not persuaded. Initially, Plaintiff does not identify specific records that support his position, and the Court takes the ALJ "at her word" when she says she has considered "all of the evidence" in reaching her decision. *Wall*, 561 F.3d at 1070. However, even assuming *arguendo* that the ALJ omitted records, close review of the chart provided in Plaintiff's brief shows that any omission was harmless.

Plaintiff's chart identifies approximately twenty separate visits. *See Doc. 16* at 14-19. If these visits are narrowed to Plaintiff's breathing problems, the ALJ's RFC analysis omits a total of six records: one from an appointment in June 2008, two in October 2008, one in April 2009 and two in March 2011. *Compare Doc. 16* at 14-19 *with AR* at 20-23.[4] However, these records do not support Plaintiff's assertion that his coughing and fatigue render him unable to lift, stand or walk on a consistent basis. *See AR* at

---

ALJ "discussed Plaintiff's subjective complaints . . . in some detail" and "thoroughly discussed" evidence which supported the inference that the plaintiff may have exaggerated the extent of her impairments. *Id.* In light of this evidence, the Tenth Circuit concluded that the plaintiff's subjective complaints and testimony were "not significantly probative" compared with the "scant objective evidence in the record." *Id.*

[4] The ALJ also omitted one record in September 2011, but that visit in particular was restricted to Plaintiff's shoulder pain and his umbilical hernia. *See Doc. 16* at 18 (citing *AR* at 355-58).

280-89, 307-18. In fact, the records are generally unfavorable to Plaintiff's position and tend to affirm the ALJ's conclusion that the severity of Plaintiff's coughing is secondary to his improper or inconsistent use of prescribed medications. *See id.* at 23.

Plaintiff's medical record from June 2008 references his chest x-ray in April of that year which the ALJ explicitly discussed and which showed no acute findings. *Id.* at 288. Plaintiff stated that he "had no real changes in his cough or phlegm production" since his chest x-ray. *Id.* Plaintiff's lungs were "clear in all six fields to auscultation." *Id.* Plaintiff's provider "reassure[d] him that the most recent x-ray was normal" and encouraged Plaintiff to exercise to help his shoulder problem, with the caveat that he start off easy and use his Albuterol before exercising. *Id.*at 289.

At his appointment on October 9, 2008, Plaintiff reported that he was having coughing attacks, but also that he was sleeping well at night because he kept his windows closed, as the cold made his coughing "much worse." *Id.* at 285. His provider noted that he did not appear to be ill or in pain and prescribed Prednisone and Singulair. *Id.* Later that month Plaintiff reported that he was feeling much better and his provider noted "that the Prednisone burst seemed to clear up his condition" and that Singulair appeared to adequately control it. *Id.* at 283.

There are no additional records until the April 2009 appointment where it was noted that Plaintiff unilaterally decided to stop using Singulair during the prior months, resulting in the gradual worsening of his cough. *Id.* at 280. Still, it was noted that Plaintiff was not in pain and did not appear ill. *Id.* Plaintiff was put back on Singulair and was told he needed to stay on it, as it was probably controlling his symptoms. *Id.*

Plaintiff was experiencing worsening symptoms in March 2011 because he ran out of medication because he forgot to renew his insurance. *Id.* at 307. Still, Plaintiff's

lungs were clear on examination. *Id.* at 308. He was restarted on all of his medications and put in touch with financial services to re-start his insurance and commence a payment plan for his medications. *Id.* Later that month Plaintiff returned complaining that his symptoms persisted. *Id.* at 317-8. He reported again being on no medication but that Singulair "improved his symptoms dramatically" in the past. *Id.* at 318. He was restarted on his medications and an exercise regimen, which he requested, was discussed "at length" with his provider. *Id.*

As summarized, these records do not indicate that Plaintiff's coughing and fatigue impairments have any significant effect on his ability to stand, walk or lift. In fact, medical providers recommended that Plaintiff exercise to improve his various conditions. Thus, the ALJ's omission of these records in particular is harmless as to Plaintiff's coughing and fatigue impairments, both because they indicate no substantive change in Plaintiff's condition when considered with his relevant medical history and because they are actually contrary to his position. *See Keyes-Zachary*, 695 F.3d at 1166 (holding the ALJ's failure to discuss evidence harmless because it did not "undermin[e] the ALJ's conclusion concerning the severity of [the plaintiff's] physical impairments"); *see also Hopper-Sanchez v. Colvin*, CIV 14-1042 JCH/KBM, Doc. 34 at 8-11 (D.N.M. 2015). Thus, Plaintiff points to nothing in the record that overwhelms the ALJ's findings. In the absence of such evidence, the Court cannot find that the ALJ erred. While the Court recognizes that Plaintiff's conditions may make it harder to perform any of the relevant strength demands, "[d]isability requires more than mere inability to work without pain." *Rose*, 2015 WL 8593444 at *4 (quoting *Brown v. Bowen*, 801 F.2d 361, 362 (10th Cir.1986); *Thompson v. Sullivan*, 987 F.2d 1482, 1488 (10th Cir.1993)).

14

Given the lack of medical evidence supporting Plaintiff's suggestion that his coughing and fatigue result in his inability to perform work consistent with his RFC, the only remaining question is whether the ALJ's analysis was legally sufficient. The Court finds that it was. As demonstrated, the ALJ reviewed all of the evidence pertinent to Plaintiff's alleged impairments and any evidence she did not explicitly review supports her findings. More importantly, however, the ALJ's analysis makes clear that she considered the strength demands required by light work and discounted those impairments, where necessary, by reference to evidence of record.

The regulatory definition of light work contemplates "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b). While she did not directly analyze Plaintiff's ability to lift, the ALJ cited Plaintiff's testimony "that he could lift 30-40 pounds and hold 20 pounds for three minutes" without succumbing to a coughing fit, *AR* at 23, 42, and noted no medical evidence supporting the notion that Plaintiff is unable to lift in a manner consistent with his RFC. These findings support the ALJ's conclusion that Plaintiff can meet the lifting requirement of light work.

Turning to Plaintiff's ability to walk and stand, the ALJ considered the subjective evidence in the file but found nothing in Plaintiff's medical records supporting the notion that he cannot engage in the "good deal" of walking and standing required by light work. 20 C.F.R. § 416.967(b).[5] This level of analysis appears sufficient under *Hendron*,

---

[5] In fact, there is evidence on which the ALJ does not rely which is contrary to Plaintiff's position. During Mark Simpson, PsyD's two-hour long mental status consultative examination he noted that Plaintiff "did not appear to have difficulty with balance, walking, or sitting[ and t]here was no evidence of pain behaviors." *AR* at 343. Plaintiff also indicated no issues with standing in his function report and, as to his ability to walk, stated that he can walk a block without rest. *AR* at

especially because Plaintiff identifies no medical evidence showing that he is unable to stand or walk on a sustained basis because of his COPD, or even indicating that he complained about these specific limitations to a medical provider.[6] *See Doc 16* at 14-9.

When the evidence relied upon by the ALJ to discount Plaintiff's subjective complaints is compared with the scant objective evidence that his coughing and fatigue affect his abilities, then here, as in *Wall*, Plaintiff's subjective complaints are simply "not significantly probative." 561 F.3d at 1068. Therefore, even assuming that the ALJ failed to account for Plaintiff's coughing and fatigue impairments, such error is harmless. For similar reasons, the ALJ's omission of a formulaic analysis of Plaintiff's ability to lift, walk and stand does not dictate reversal. *See Hendron*, 767 F.3d at 957.

## B) THE ALJ ADEQUATELY EXPLAINED HER DECISION TO DISCOUNT LIMITATIONS IDENTIFIED BY CONSULTATIVE EXAMINER SIMPSON.

Plaintiff argues that the ALJ omitted certain cognitive limitations set forth in the reports of Mark Simpson, Psy.D., specifically, his difficulty completing time-sensitive tasks due to impaired performance speed and moderate limitations in his abilities "to carry out instructions, to concentrate, and to work without supervision." *Doc. 16* at 19.

217. Plaintiff also reported that he does not use crutches, a cane, a wheelchair, or a walker to assist his ambulation. *Id.* at 218.

[6] This is especially true in because analysis as to Plaintiff's abilities to walk and stand on a sustained basis may not have even been necessary. The regulations provide that a job fits within the definition of light work when it involves "a good deal of walking or standing, *or* when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b) (emphasis added). Plaintiff was found to have the residual functional capacity to re-enter the workforce as a small products assembler, mail sorter or a cashier. None of these jobs necessarily require a great deal of standing, and all avoid the environmental irritants that exacerbate Plaintiff's symptoms. AR at 24 (citing Dictionary of Occupational Titles ("DOT") numbers 706.684-022, 209.687-026, 211.462-010). Furthermore, Plaintiff does not argue that he cannot sit for extended periods of time and occasionally walk and stand. *Compare Doc. 16* at 23 (arguing that if Plaintiff had been restricted to sedentary work then he would be presumptively disabled due to his age) with 20 C.F.R. § 404.1567(a) (stating the requirements for sedentary jobs). Thus, it is possible that Plaintiff's concerns about his abilities to walk and stand were entirely immaterial to the ALJ's analysis.

Plaintiff further argues that the ALJ committed reversible error by assigning Dr. Simpson's opinion no weight. *Id.* at 20. The Court disagrees.

Dr. Simpson is a state agency consultant, so the ALJ was not free to ignore his opinion and was required to explain the weight given to it. 20 C.F.R. § 404.1527(e)(2); SSR 96-6p(2). However, "[a]dministrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." 20 C.F.R. § 404.1527(e)(2)(i). When considering whether to accept the findings of state agency psychological consultants, the ALJ considers the same factors as she would with any other medical provider, "such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions." 20 C.F.R. § 404.1527(e)(2)(ii); *compare* 20 C.F.R. § 404.1527(c). The ALJ's analysis of Dr. Simpson's opinion meets these requirements.

Dr. Simpson examined Plaintiff on July 29, 2011, and August 21, 2011. *AR* at 343.[7] Dr. Simpson noted that Plaintiff "present[ed] as someone who is undereducated" but "he did not have difficulty communicating his thoughts, attending, concentrating, or with memory." *Id.* at 345. Plaintiff's thought process was described as linear and goal-directed and his insight and judgment were described as fair. *Id.* Dr. Simpson administered the Wechsler Adult Intelligence Scale – IV ("WAIS – IV") and his initial comment in his report is that Plaintiff "did not seem to put forth appropriate effort." *Id.* Dr. Simpson explained that while Plaintiff presented as being undereducated, he did not

---

[7] Plaintiff's first examination, which lasted twenty minutes, was interrupted by his "incessan[t]" coughing. *AR* at 343. He did not cough throughout the duration of his second, two-hour long, examination. *Id.*

present as mildly retarded, which is what his full scale IQ score ("FSIQ") of 67 on the

WAIS – IV  indicated. *Id.* Dr. Simpson further noted that these results are inconsistent

with Plaintiff's scores on a prior intelligence examination administered by Mark Arcuri,

Ph.D., which placed Plaintiff in the borderline range of intellectual functioning, with a

FSIQ score of 74. *Id.* at 251; 345. Dr. Simpson specifically noted that Plaintiff's

processing speed index score was "in the extremely low range" with a score of 65, as

compared to 76 on the previous test. *Id.* Dr. Simpson noted that such a difference in

scores would ordinarily be explained by a traumatic brain injury, and, as such, the test

results "should be used conservatively." *Id.* at 345. Nonetheless, Dr. Simpson's testing

was consistent with Dr. Arcuri's insofar as Plaintiff's working memory index score

increased from 65 on the previous text to 69. *Id.* at 251; 345. Dr. Simpson accordingly

diagnosed Plaintiff with, among other things, "Borderline Intellectual Functioning vs. Mild

Mental Retardation" and listed his Global Assessment of Functioning ("GAF") score as

55. *Id.* at 346. Based on these results, Dr. Simpson provided the following statement of

his opinion of Plaintiff's abilities:

  I. Understand and Remember
    • Detailed or complex instructions: Moderate Limitation
    • Very short and simple instructions: Mild Limitation
  2. Sustained Concentration and Task Persistence
    • Ability to Carry Out Instructions: Moderate Limitation
    • Ability to Attend and Concentrate: Moderate Limitation
    • Ability to Work without Supervision: Mild – Moderate Limitation
  3. Social Interactions
    • Ability to Interact with Public: No – Mild Limitation
    • Ability to Interact with Co-workers: No – Mild Limitation
    • Ability to Interact with supervisors: No – Mild Limitation
  4. Adaptation
    • Ability to Adapt to Changes in the Workplace: Mild Limitation
    • Ability to be Aware of Normal Hazards in the workplace: Mild Limitation
    • Ability to Use public Transportation or Travel to Unfamiliar Places:
    Moderate Limitation

*Id.*

The ALJ states the limitations contained in Dr. Simpson's opinions at two different points in her opinion: first when considering whether or not his impairments meet the listings, and second when engaging in her more thorough RFC analysis. *See id.* at 17, 22. In finding that Plaintiff does not meet section 12.05 (intellectual disability) of the listings the ALJ noted that Plaintiff has moderate difficulties with regard to concentration, persistence, and pace, but did not have "a valid verbal, performance, or full scale IQ score of 60-70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* at 16-7. Here, the ALJ noted Dr. Simpson's statement that Plaintiff's full scale IQ score of 67 should be used conservatively. *Id.* at 17. The ALJ then devoted almost a page of her roughly five-and-one-half page RFC analysis to Dr. Simpson's report. *See AR* at 21-2. Not only did she discuss his findings as to Plaintiff's abilities in detail, but she further outlined Plaintiff's psychological history as it was reported to Dr. Simpson. *Id.* The ALJ noted that Plaintiff has moderate limitations in his ability to carry out instructions and as to his abilities to attend and concentrate, but that the limitation of his ability to work without supervision was only "mild," rather than "mild – moderate," as stated by Dr. Simpson. *Id.* at 22. At this point the ALJ again references Dr. Simpson's statement that Plaintiff did not give appropriate effort during testing and Plaintiff's previous result of borderline intellectual functioning. *Id.* She also describes the full results of Plaintiff's testing with specificity, relying on Dr. Simpson's statement that Plaintiff's results should be used conservatively in light of his prior results. *Id.* Finally, when discussing Plaintiff's credibility, the ALJ describes his test results as "questionable" in light of Dr. Simpson's statements. *Id.* at 23.

The depth of the ALJ's analysis shows that, contrary to Plaintiff's position, she considered Dr. Simpson's report and assigned it significant weight. In fact, nearly all of the substantive content of the ALJ's opinion related to Plaintiff's cognitive difficulties comes from Dr. Simpson's report, and the ALJ copies verbatim all restrictions noted by Dr. Simpson, with the exception of his "mild – moderate" impaired ability to work without supervision. The ALJ's reliance on Dr. Simpson's opinion continued to the extent that she decided not to give significant weight to his WAIS – IV test results because she found them to be questionable for the reasons stated in Dr. Simpson's report. This is in keeping with 20 C.F.R. Section 404.1527(c)(6), which permits the ALJ to consider any factor "which tend[s] to support or contradict the opinion." *Id.*; *see e.g.*, *Vigil*, 805 F.3d at 1202 (affirming an ALJ's decision to give a medical opinion lesser weight due to inconsistency between exam findings and recommended restrictions).

Plaintiff's reply brief asserts that, because Dr. Simpson made other findings that support his opinions as to Plaintiff's abilities, "the ALJ's stated reason" for discounting his test results "is not sufficient." *Doc. 21* at 3. Plaintiff appears to argue that the ALJ was required to further explain why she was heeding Dr. Simpson's cautionary statement, or even to follow-up with Dr. Simpson and ask him to clarify why he found moderate limitations as to Plaintiff's abilities despite the test results. *Id.* at 4. Yet, Plaintiff cites no authority to support these arguments. More importantly, there was nothing to clarify. Dr. Simpson's evaluation revealed significant inconsistencies between Plaintiff's perceived mental functioning and the results of standardized testing. In this light, substantial evidence supports the ALJ's conclusion that Plaintiff's mental abilities as adduced by his "questionable" test results do not prevent him from working (a

20

sentiment echoed by the state-agency psychiatric consultants, whose opinions the ALJ

afforded significant weight, *AR* at 23, 66-7, 74-5).[8] Accordingly, the Court finds no error.

### C) THE ALJ'S FAILURE TO DISCUSS THE PSYCHOEDUCATIONAL EVALUATION COMPLETED BY MARK ARCURI IS HARMLESS.

Plaintiff next argues that the ALJ erred by failing to adequately explain her

assessment of the evidence from Mark Arcuri, Ph.D., who conducted a

psychoeducational evaluation of Plaintiff on May 21, 2009. *Doc. 16* at 4. The

Commissioner agrees that this omission is error, but counters that the error is harmless

because the three state-agency psychologists that the ALJ expressly relies on – Drs.

Simpson, Wise and Walker – refer to the evaluation in their reports. *Doc. 20* at 14-5.

The Court agrees that the error is harmless, not because the other doctors discussed

Dr. Arcuri's opinion, but because the omitted opinion is consistent with the other

evidence in the record and Plaintiff's RFC. *See Keyes-Zachary*, 695 F.3d at 1161-2

(finding no error where the plaintiff failed to identify any inconsistencies between the

records discussed by the ALJ or with the plaintiff's RFC); *Howard*, 379 F.3d at 947 ("in

---

[8] Consultative examiner Wise found no significant limitations in Plaintiff's ability to remember locations and work-like procedures, his ability to understand, remember and carry out very short and simple instructions, his ability to maintain attention and concentration for extended periods, his ability to perform activities within a schedule, his ability to sustain an ordinary routine without special supervision, his ability to work with or in proximity to others, his ability to make simple work-related decisions, and his ability to complete a normal workweek and to perform at a consistent pace without an unreasonable number and length of rest periods. *AR* at 66. Dr. Wise also noted that Plaintiff has a moderate limitation in his ability to understand, remember and carry out detailed instructions. *Id.* Dr. Wise concluded that Plaintiff's mental status does not impair his ability to perform work, but that he should be "limited to simple, non-academic tasks. . . ." *Id.* at 67. On reconsideration, consultative examiner Walker assessed Plaintiff with a severe organic mental disorder and indicated that Plaintiff has mild restrictions in performing the activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence and pace. *Id.* at 75. Dr. Walker agreed with Dr. Wise that Plaintiff is able to complete unskilled work and noted no "significant decline in mental functioning" since Dr. Simpson's report. *Id.*

this case none of the record medical evidence conflicts with the ALJ's conclusion that claimant can perform light work.").

While it is true that "[i]t is the ALJ's duty to give consideration to all the medical opinions in the record" and to assign weight to those opinions, *Keyes-Zachary*, 695 F.3d at 1161 (citing 20 C.F.R. §§ 404.1527(c); 404.1527(e)(2)(ii); 416.927(c); and 416.927(e)(2)(ii)), "[w]hen the ALJ does not need to reject or weigh evidence unfavorably to determine a claimant's RFC, the need for express analysis is weakened." *Id.* at 1161-2 (quoting *Howard*, 379 F.3d at 947). In such cases, "an ALJ's failure to weigh a medical opinion involves harmless error if there is no inconsistency between the opinion and the ALJ's assessment of residual functional capacity." *Mays*, 739 F.3d at 578-79 (citations omitted); *Akers v. Colvin*, 556 F. App'x. 754, 758 (10th Cir. 2014) (unpublished) (holding that if a medical opinion "supports and does not contradict" the ALJ's RFC finding, then there is no error) (citations omitted); *Keyes-Zachary*, 695 F.3d at 1165 ("These specific limitations that Dr. Crall assigned to Ms. Keyes–Zachary were not inconsistent with the limitations the ALJ placed in her RFC."). It is the plaintiff's burden to show that an ALJ's failure to consider an opinion has resulted in prejudice. *Mays*, 739 F.3d at 579.

Plaintiff's showing of such prejudice is scant. Plaintiff's "issues for review" contend that the "ALJ failed to adequately explain her assessment of the evidence . . . from examining psychologist Dr. Arcuri." *Doc. 16* at 4. Plaintiff then discusses in detail the contents of Dr. Arcuri's opinion over the course of three pages, but the only limitation contained in Dr. Arcuri's report that he points to in his motion and reply brief is his "difficulty completing time-sensitive tasks" due to his "impaired performance speed." *See id.* at 5-20; *Doc. 21* at 2. These limitations, however, were documented by Dr.

Simpson, and nothing in Dr. Arcuri's opinion contradicts agency consultants Drs. Wise and Walker's findings, which were adopted by the ALJ, that these difficulties are not severe enough to keep him from working. *See AR* at 23, 61, 75.

Dr. Arcuri performed a psychoeducational evaluation of Plaintiff on May 21, 2009. *AR* at 246. Plaintiff was referred to Dr. Arcuri by the Division of Vocational Rehabilitation ("DVR") after completing a prior job placement working on the Big-I intersection. *Id.* Dr. Arcuri sought to assess Plaintiff's cognitive, intellectual, vocational, and general functioning to determine his eligibility for DVR services and to formulate a plan to help him re-enter the workforce. *Id.* Plaintiff reported that he "would like to find any sort of work for which he might qualify" and that he "would do anything possible to work." *Id.* at 254. Dr. Arcuri noted that Plaintiff was friendly, cooperative and appeared interested in the task at hand. *Id.* Dr. Arcuri noted that Plaintiff performed activities of daily living unassisted and appeared "capable of independent living." *Id.* at 247. Plaintiff reported that he "attended Albuquerque High School where he was 'pushed through' until he got to the tenth grade," after which he was kicked out for truancy. *Id.* at 250. Dr. Arcuirt indicated Plaintiff reported being in special education throughout school. *Id.*[9]

Dr. Arcuri noted that Plaintiff put forth "reasonable" effort in completing psychological testing and that the results from the evaluation were "likely to be an accurate assessment" of Plaintiff's cognitive abilities. *Id.* at 247. Dr. Arcuri had Plaintiff complete Trailmaking Parts A and B, which he did without error "and marginally within normal time limits." *Id.* Plaintiff scored 26/30 points on the Mini Mental Status Examination, which Dr. Arcuri noted to be "consistent with a normal mental status[.]" *Id.*

---

[9] Plaintiff maintained in his hearing testimony that he was "regular school" student and not in special education. *AR* at 34, 55-56.

at 250-1. Dr. Arcuri also had Plaintiff complete a WAIS - III aptitude examination with the following scores: FSIQ: 74; WMI: 65; PSI: 76. *Id.* at 251. Based on his scores, Dr. Arcuri diagnosed Plaintiff with Borderline Intellectual Functioning. *Id.* Dr. Arcuri noted that Plaintiff's performance indicated that he "requires memory aids when working with complex verbal material" and recommended that Plaintiff make lists and write out instructions to compensate for his relatively impaired working memory. *Id.* at 252. Dr. Arcuri further noted that Plaintiff's "processing speed skills are generally poor" insofar as he "works significantly more slowly than many others do" and stated that he would "do best in vocational settings where he can work on untimed hands-on tasks that rely on rote experience and longer-term memory." *Id.* Plaintiff's word reading ability was noted to be equivalent to a 1.9 grade level, his sentence comprehension ability was equivalent to a 1.2, his spelling ability was at a K.9, and his math computation was at a 2.7. *Id.* Dr. Arcuri noted that Plaintiff was reportedly unable to complete Millon Clinical Multiaxial Inventory – III testing, a ZUNG Self-Rating Depression Scale, an AMEN ADD Checklist, and a Career Assessment Inventory "due to his reading ability." *Id.* at 253-4.

Dr. Arcuri stated that, "[o]verall, [Plaintiff] is a reasonable candidate for success with DVR provided that he continues to work towards emotional stability, and provided that his eventual diagnosis related to his respiratory problems does not preclude working." *Id.* at 255. Dr. Arcuri noted the following barriers to employment in Plaintiff's case: emotional lability which interferes with performance, unable to follow complex verbal instructions, impaired performance speed, impaired ability to use written materials, and limited endurance. *Id.* at 256. Dr. Arcuri noted no problems with Plaintiff's ability to initiate tasks, sustain attention, communicate verbally, and complete tasks without support. *Id.* Thus, Dr. Arcuri recommended that Plaintiff be provided vocational

24

training, seek loosely-timed work settings with "hands-on and relatively rote tasks,"
"write out complex verbal materials to aid memory," and "[e]xplore options for benefits
such as disability." *Id.*

Dr. Arcuri's report is consistent with those of Drs. Simpson, Wise and Walker. All
assessed Plaintiff with an organic mental disorder, and Dr. Simpson specifically
diagnosed him with borderline intellectual functioning versus mild mental retardation. *Id.*
at 66-67, 75, 251, 346. All but Dr. Wise also recognized that Plaintiff has some issues
with processing speeds. *Id.* at 252, 346. Additionally, Plaintiff's scores on testing
administered by Dr. Arcuri indicate that Plaintiff is less limited cognitively than do his
scores on testing administered by Dr. Simpson (hence Dr. Simpson's cautionary
statement as to the results he obtained). To wit, Plaintiff's GAF decreased from 60 to 55
between Drs. Arcuri and Simpson's examinations. *Compare id.* at 257 *with* 346. While
Dr. Arcuri's findings show that Plaintiff may have some cognitive limitations, those
limitations are not in and of themselves severe enough to completely preclude him from
working, as it was recommended that he write out complex instructions and seek jobs
with hands-on and repetitive tasks. This finding is consistent with those of Drs. Wise
and Walker. *AR* at 67, 75. Thus, because Dr. Arcuri's limitations are consistent with the
other opinions in the record, the ALJ's omission of his report in her discussion is
harmless.

### D) THE ALJ WAS NOT REQUIRED TO INCLUDE LIMITATIONS SHE FOUND TO BE UNSUPPORTED IN HER HYPOTHETICAL QUESTION TO THE VE.

Plaintiff argues that the ALJ committed reversible error by relying on the VE's
testimony because the ALJ's hypotheticals at the hearing did not include all of Plaintiff's
asserted impairments. *Doc. 16* at 4. However, the Court has already found that

Plaintiff's RFC accounts for all pertinent limitations in the record. Plaintiff does not claim that the ALJ misstated any of his limitations in posing hypotheticals to the VE, but only that "the RFC finding failed to include all limitations that are supported by the evidence." *Doc. 16* at 21. Having already fully analyzed Plaintiff's RFC above, the Court is satisfied that the ALJ's hypothetical questions to the VE were accurate and complete. *Bean v. Chater*, 77 F.3d 1210, 1214 (10th Cir. 1995) ("The hypothetical question should include all – and only – those impairments borne out by the evidentiary record. . . . The ALJ was not required to accept the answer to a hypothetical question that included limitations claimed by plaintiff but not accepted by the ALJ as supported by the record.").

### E)   ANY ERROR RESULTING FROM THE ALJ'S FAILURE TO RESOLVE CONFLICTS BETWEEN THE VE'S TESTIMONY AND THE DOT IS HARMLESS.

Plaintiff argues that the ALJ committed reversible error by failing to resolve conflicts between the VE's testimony and the DOT. *Doc. 16* at 4. Specifically, Plaintiff argues that the jobs of mail sorter and cashier which require a General Educational Development reasoning level of three, are inconsistent with his RFC, which limits him to simple, routine and repetitive tasks. *Id.* at 21 (citing *Hackett v. Barnhart*, 3895 F.3d 1168 (10th Cir. 2005)). Plaintiff further argues that the job of small products assembler, with a reasoning level two, is inconsistent with his RFC's restriction to occupations that do no require complex written communication, especially because he claims the evidence shows he is unable to "understand any written instructions." *Id.* at 22 (citing Dr. Arcuri's report). Plaintiff argues that these discrepancies required the ALJ to seek a reasonable explanation from the VE as to why he is able to perform these jobs notwithstanding his RFC. *Id.* at 21-2. The Court disagrees.

Before an ALJ may rely on VE testimony as substantial evidence to support a determination of nondisability, the ALJ must ask the expert to explain any conflicts between his findings and the DOT relating to any "occupational information." *Hackett*, 395 F.3d at 1175 (citing *Haddock v. Apfel*, 196 F.3d 1084 (10th Cir. 1999); SSR 00-4p, 2000 WL 1898704). "Each job listed in the DOT is described by reference to various components." *Id.* One component is General Educational Development, or "GED." DOT, APPENDIX C - COMPONENTS OF THE DEFINITION TRAILER, 1991 WL 688702 (4th Ed. 1991).

> General Educational Development embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance. This is education of a general nature which does not have a recognized, fairly specific occupational objective. Ordinarily, such education is obtained in elementary school, high school, or college. However, it may be obtained from experience and self-study.

*Id.* "The GED Scale is composed of three divisions: Reasoning Development, Mathematical Development, and Language Development." *Id.* "The description of the various levels of language and mathematical development are based on the curricula taught in schools throughout the United States." *Id.* A GED level of 1 is equivalent to curriculum taught in grades 1-3, a GED level of 2 is equivalent to curriculum taught in grades 4-6, and a GED level of 3 is equivalent to curriculum taught in grades 7-8. NATIONAL OCCUPATIONAL INFORMATION COORDINATING COMMITTEE, VOCATIONAL PREPARATION AND OCCUPATIONS VOL 1 D/6-D-6 (3rd Ed. 1982) (Reference D – Relating GED to Career Planning).

Plaintiff is correct that in *Hackett* the Tenth Circuit found an ALJ's restriction of the plaintiff to simple and repetitive tasks to be inconsistent with jobs involving level-three reasoning and remanded that case so that the ALJ could resolve this apparent

conflict. *Hackett*, 395 F.3d 1168, 1175. Plaintiff is also correct that the jobs of Cashier II and Mail Clerk require level-three reasoning, meaning that they are facially inconsistent with simple and repetitive tasks under a broad reading of the *Hackett* rationale. *See* DOT §§ 211.462-010, 1991 WL 671840 and 209.687-026, 1991 WL 671813. Accordingly, Plaintiff's argument as to these two jobs is persuasive in the abstract at first blush. However, the Court has some doubts as to whether the *Hackett* rationale should apply here.

The ALJ limited Plaintiff's mental RFC in reliance on the psychiatric opinions discussed above. While this was proper under the regulations, it ignores the fact that Plaintiff did not initially stop working because of mental decline, but, rather because of his respiratory issues. *AR* at 255, 275. In fact, Plaintiff was still looking for work when he met with Dr. Arcuri in May of 2009 (plaintiff's application for benefits states that he stopped working in January, 2008). *See id.* at 169, 246-56. Also, Plaintiff successfully worked as a structural carpenter,[10] which requires level three reasoning and language skills, for many years. *See* DOT 869.664-014, 1991 WL 687601. In comparison, both mail sorters and cashiers require a reasoning level of three but language levels of only two. *See* DOT at 209.687-026, 1991 WL 671813; *id.* at 211.462-010, 1991 WL 671840. Thus, the Court would not find any readily apparent inconsistency between Plaintiff's RFC and the DOT, absent the *Hackett* conclusion that there "seems" to be one. *Compare Hackett*, 395 F.3d at 1176 *with Keyes-Zachary*, 695 F.3d at 1173 (noting that the plaintiff's past relevant work was skilled and semi-skilled regardless of her low IQ score and explaining that "[t]he disability inquiry has to do with what kind of substantial gainful work the claimant can *do*, not just with her numerical scores."). Nonetheless,

---

[10] Which the VE testified fits within DOT number 869.664-014 "Construction Worker I." *AR* at 55.

*Hackett* cannot be ignored. Therefore, the Court assumes out of an abundance of caution that the ALJ erred by failing to clarify why Plaintiff's RFC permits him to perform level three reasoning positions, generally.

However, any error in this regard is harmless because the ALJ identified a third job – small products assembler – which only requires a reasoning level of two. DOT at 706.684-022, 1991 WL 679050; *see Anderson v. Colvin*, 514 Fed. Appx. 756, 764 (10th Cir. 2013) ("Even if Ms. Anderson was limited to unskilled work that had a Reasoning Development Level of 1, the VE identified at least two such jobs . . . that the ALJ found exist in significant numbers, which finding she does not dispute."). While the *Hackett* court rejected the notion that an RFC limiting a disability claimant to simple, repetitive, work is consistent with level three reasoning, it specifically opined that "level two reasoning appears more consistent with Plaintiff's RFC." *Hackett*, 395 F.3d at 1176. As such, there is no apparent inconsistency between the job of a small products assembler and Plaintiff's RFC.

To the extent that Plaintiff argues that level-two reasoning is inconsistent with his RFC because he is restricted to jobs not requiring "complex written communication," the Court is not persuaded. True, level-two reasoning requires a worker to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions[.]" 1991 WL 688702. This is not inconsistent with Plaintiff's RFC, however, which limits him only to occupations not requiring "complex *written* communication." *AR* at 18. It is entirely reasonable that Plaintiff could still work in environments with detailed verbal communication, assuming he is provided with the tools for success identified by Dr. Arcuri, such as "to write out complex verbal material to aid memory." *Id.* at 256. Moreover, while it requires level-two reasoning, the position of small products

assembler only requires level-one language skills. *See* 1991 WL 679050. Level one is

the lowest category for language within the GED scale and is consistent Dr. Arcuri's

findings as to Plaintiff's first-grade reading level. *AR* at 253. A language level of one is

also appropriate in cases, like this, where a plaintiff claims total illiteracy. *See Davison*

*v. Colvin*, 596 F. App'x 675, 682 (10th Cir. 2014). Therefore, there is no apparent

inconsistency between the VE's testimony and the DOT as to the job of small products

assembler, rendering the ALJ's failure to remedy any inconsistencies between the VE's

testimony and the DOT harmless.

### F)  THE ALJ DID NOT ERR BY RELYING ON THE GRIDS AS A FRAMEWORK FOR HER ANALYSIS.

Plaintiff argues that it was error for the ALJ to use 20 C.F.R. Section 404,

Subpart P, Appendix 2 ("the grids") as a framework to find Plaintiff not disabled under

the rules for light work because he would be considered disabled had he been limited to

sedentary work. *Doc. 16* at 22-4 (citing DI 25025.015(D); *Thompson*, 987 F.2d at 1491;

*Huston v. Bowen*, 838 F.2d 1125, 1131 (10th Cir. 1988)). The Commissioner counters,

and the Court agrees, that substantial evidence supports the ALJ's decision that Plaintiff

can perform light work and so there is no error. *Doc. 20* at 23.

"The grids contain tables of rules which direct a determination of disabled or not

disabled on the basis of a claimant's RFC category, age, education, and work

experience." *Thompson*, 987 F.2d at 1487 (citing 20 C.F.R. § 404, Subpt. P, App. 2).

These rules "may not be applied conclusively in a given case unless the claimant's

characteristics precisely match the criteria of a particular rule" or, in other words, "unless

the claimant could perform the full range of work required of that RFC category on a

daily basis and unless the claimant possesses the physical capacities to perform most

of the jobs in that range." *Id.* (citations omitted). Program Operations Manual System

("POMS") section DI 25025.015 advises that if a plaintiff's exertional capacity falls

between two rules with different conclusions then the ALJ should

> apply the: higher-numbered rule and find the claimant not disabled if you
> conclude the claimant has a slightly reduced capacity for the higher level
> of exertion; or lower-numbered rule and find the claimant disabled if you
> conclude the claimant has a significantly reduced capacity for the higher
> level of exertion.

POMS DI 25025.015(D).[11]

In this case the ALJ noted that if Plaintiff had the capacity to perform a full range

of light work, then medical vocational guideline rule 202.18 and 202.11 would support a

finding of no disability. *AR* at 24; *compare* 20 C.F.R. § 404, Subp. P, App. 2, Rule Nos.

202.18 and 202.11. However, because the ALJ found certain limitations to Plaintiff's

abilities, she deferred to the VE's opinion that Plaintiff could perform the three jobs

already discussed. *AR* at 24. Plaintiff argues that his limitations should have caused the

ALJ to apply rule numbers 201.09, 201.11 and 201.17, which all assume a sedentary

RFC. *Doc. 16* at 23. However, as explained above, the ALJ's finding that Plaintiff

maintains the capacity to perform light work except as limited by his RFC is supported

by substantial evidence. Therefore, the ALJ did not err by applying the higher numbered

rules and accordingly finding Plaintiff not disabled under them.

Plaintiff argues that *Thompson*, 987 F.2d at 1487, compels a different result

because the ALJ's RFC finding was based on findings that he is not credible. *Doc. 16* at

24. The Court agrees that an adverse credibility finding alone is not sufficient to "compel

a finding of not disabled." *Thompson*, 987 F.2d at 1491. Rather, before using the grids

"[t]he ALJ must also determine whether the claimant has an RFC level and can perform

---

[11] Located at: <https://secure.ssa.gov/poms.nsf/lnx/0425025015>

the full range of work at his or her RFC level on a daily basis . . . . The ALJ must also determine whether the claimant can perform most of the jobs at his or her RFC level." *Id.* (citation omitted). Contrary to Plaintiff's argument, *Doc. 16* at 24, this is exactly what the ALJ did at steps four and five of her analysis. As documented above, the ALJ extensively analyzed Plaintiff's RFC, found that he can perform a full range of light work with restrictions, and then employed the VE testimony to determine that Plaintiff can perform jobs which exist in significant numbers. *See AR* at 18-24. While the ALJ's credibility findings were necessarily part of this analysis, they are not the sole basis for her conclusion and, as further explained below, those findings are supported by substantial evidence. For these reasons, the Court concludes that the ALJ committed no error by using the grids as a framework for her analysis.

### G) THE ALJ'S CREDIBILITY FINDINGS ARE SUPPORTED BY THE RECORD.

Plaintiff's final argument relates to the ALJ's credibility findings. *Doc. 16* at 25. "Credibility determinations are peculiarly the province of the finder of fact and [the Court] will not upset such determinations when supported by substantial evidence." *Hackett*, 395 F.3d at 1173 (quoting *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)). An ALJ's credibility findings are entitled to "special deference," *Lax v. Astrue*, 489 F.3d 1080, 1089 (10th Cir. 2007), and the Court will uphold a finding so long as it is "closely and affirmatively linked" to record evidence. *Wall*, 561 F.3d at 1070. Contrary to Plaintiff's assertion, "a formalistic factor-by-factor recitation of the evidence" is not required, "so long as the ALJ sets forth the specific evidence [s]he relies on in evaluating the claimant's credibility." *Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009) (citations omitted).

After taking Plaintiff's testimony and medical history into account, the ALJ concluded that his "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible. . . ." *AR* at 20. First, the ALJ found that Plaintiff's statements that he could not read or write were not credible because he testified at the hearing that he completed the ninth grade and was not in special education classes. *Id.* at 23. The ALJ also references Dr. Simpson's warning that Plaintiff's WAIS-IV testing should be used conservatively because of the inconsistency between Plaintiff's scores as compared to the prior evaluation by Dr. Arcuri. *Id.* The ALJ also discredited Plaintiff's statements about the limiting effects of his COPD, noting that he does not use oxygen, "there are few medical records apart from some visits to the hospital for bronchitis and exacerbations," and certain medical records indicated noncompliance in properly taking medications. *Id.* The ALJ also found "no medical records that justify that the plaintiff should perform less than light work" and afforded significant weight to the opinion of state medical consultants who reviewed the medical records and found nothing indicating that Plaintiff's breathing or mental problems are severe enough to keep him from working. *Id.* Finally, the ALJ considered a function report offered by Plaintiff's wife and found that "while it reflects certain limitations, it also reflects that claimant performs many activities of daily living." *Id.*

Plaintiff argues that the ALJ's credibility findings as to the limiting effects of his COPD are not supported by the evidence because he "attended many doctor appointments," "did not exclusively seek care at the ER" and only failed to properly use his medications because he could not afford them. *Doc. 16* at 25; *Doc 21* at 5. Plaintiff's argument that he presented for non-emergent treatment of his COPD on "many"

33

occasions (challenging the ALJ's finding that there were "few" records) asks the Court to reweigh the evidence, which it cannot do. As shown by the above analysis, the ALJ's findings as to the limiting effects of Plaintiff's COPD are supported by substantial evidence, and it is her prerogative to determine whether the nature and amount of treatment sought by Plaintiff of his COPD is consistent with his allegations of disabling symptoms.

Plaintiff's assertion that he did not take his medications because he could not afford them is not supported by the record. *Compare Doc 21* at 5 *with AR* at 307-8. The record Plaintiff cites from March 8, 2011, is addressed above. At that visit Plaintiff presented for acute care because of his own failure to keep his medications and insurance current. *AR* at 307-8. Plaintiff reported to his doctor that he had gone to the pharmacy to refill his prescriptions and was told that he no longer had refills or insurance. *Id.* at 307. Plaintiff told his provider that "his insurance cancels if he does not remember to renew it." *Id.* The visit concluded with the provider noting that Plaintiff was restarted on all medications and set up with financial services to defer payment for his medications and to reestablish his insurance. *Id.* at 308. Thus, contrary to Plaintiff's position, the record establishes that Plaintiff had means to get his medication, he just failed to keep those means current. Even if the record supported Plaintiff's argument, one example of his inability to afford his medication does not overwhelm the other evidence in the record showing that his medication non-compliance was generally for other than financial reasons. *See, e.g.*, *AR* at 312 (cited by ALJ at page 23 of the record). Therefore, substantial evidence supports the ALJ's decision to discredit Plaintiff's statements as to the limiting effects of his COPD.

34

Plaintiff also argues that it was error for the ALJ to find his statement that he is unable to read or write not credible. *Doc. 16* at 25. He asserts that the ALJ erred when she relied on his testimony that he completed the ninth grade and did not attend special education. Plaintiff contends that he was just passed-along from grade to grade, and that "a 9ᵗʰ grade student could be unable to read or write effectively in the State of New Mexico." Plaintiff argues that he told Dr. Arcuri that he was unable to pass a test to join the military and in fact did attend special education. *Id.* Plaintiff also maintains that his inability to read is supported by his diagnosis of borderline intellectual functioning. *Id.* at 26.

Despite what he may have told Dr. Arcuri, Plaintiff testified, under oath, that he was never in special education at two different times at the hearing. *AR* at 33-34, 55-56. Furthermore, while it may be true that a ninth-grade student in New Mexico may not be able to read and write "effectively," Plaintiff's testimony and Dr. Arcuri's testing belie his assertions that he cannot read or write *at all*. Plaintiff testified at the hearing that he can read "a few things" and Dr. Arcuri's testing indicated that Plaintiff is able to read and write, albeit at low levels. *Id.* at 41, 253. Finally, Plaintiff cites no evidence or authority for the proposition that his diagnosis of borderline intellectual functioning correlates to his inability to read or write, and Dr. Arcuri's results are directly contrary to that assertion. Thus, the ALJ's credibility findings are supported by substantial evidence and Plaintiff cites nothing that overwhelms the evidence on which she relies. Therefore, there is no error.

## IV.   CONCLUSION

For these reasons, the Court concludes that the ALJ committed no reversible error in her analysis of Plaintiff's claims and that her findings should be affirmed.

Wherefore,

**IT IS HEREBY RECOMMENDED** that Plaintiff's motion to remand *(Doc. 22)* be denied.

_____
UNITED STATES CHIEF MAGISTRATE JUDGE

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition, they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).

**A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**